

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-8-1999

# APT PGH. Ltd. Partnership v Penn Twp

Precedential or Non-Precedential:

Docket 98-3519;98-3546

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

## Recommended Citation

"APT PGH. Ltd. Partnership v Penn Twp" (1999). *1999 Decisions.* Paper 300.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/300

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 8, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 98-3519 and 98-3546

APT PITTSBURGH LIMITED PARTNERSHIP

Appellant in No. 98-3546

v.

PENN TOWNSHIP BUTLER COUNTY OF PENNSYLVANIA,
a Political subdivision of the Commonwealth of
Pennsylvania, PENN TOWNSHIP BOARD OF
SUPERVISORS and PENN TOWNSHIP ZONING HEARING
BOARD

Appellants in No. 98-3519

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 98-cv-00129)
District Judge: Honorable Donetta W. Ambrose

Argued May 6, 1999

BEFORE: NYGAARD, ALDISERT and STAPLETON,
Circuit Judges

(Opinion Filed November 8, 1999)

        Clifford B. Levine (Argued)
        Thorp, Reed & Armstrong
        One Riverfront Center
        Pittsburgh, PA 15222
         Attorney for Appellee/Cross
         Appellant APT Pittsburgh Limited
         Partnership

David F. Toal (Argued)
Frank, Bails, Murcko & Toal
707 Grant Street
33rd Floor, Gulf Tower
Pittsburgh, PA 15219
 Attorney for Amicus Curiae
 Personal Communications Industry
 Association

Thomas L. Wenger
Steven R. Williams
Wix, Wenger & Weidner
508 North Second Street
P.O. Box 845
Harrisburg, PA 17108-0845
 Attorneys for Amicus Curiae
 Pennsylvania State Association of
 Township Supervisors

Philip P. Lope (Argued)
Lope & Houlihan
207 East Grandview Avenue
Zelienople, PA 16063
 Attorney for Appellants/Cross
 Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Penn Township ("Township") appeals the District Court's order directing it to allow APT Pittsburgh Limited Partnership ("APT") to erect a communications tower for its Personal Communications System ("PCS") at a designated site within the Township. The Township claims that the District Court erred in concluding that its zoning ordinance was impermissibly exclusionary under the Pennsylvania Constitution. APT defends the District Court's conclusion on that score and cross-appeals the District Court's conclusion that the Township's zoning ordinance did not also violate the 1996 Telecommunications Act ("TCA"), 47 U.S.C. S 332(c)(7)(B)(i)(II) & (iii), and, as a result, 42 U.S.C.

2

S 1983 as well. We conclude that the Township's ordinance is not invalid under state law or the TCA and will reverse.

I.

APT holds a license from the Federal Communications Commission ("FCC") to provide wireless PCS services in the Pittsburgh Major Trading Area ("PMTA"), which includes Penn Township. APT's FCC license requires it to provide "seamless" coverage in the PMTA. PCS systems are arranged around service "cells" that are anchored upon a communications facility that transmits and receives signals from PCS users traveling within the cell. The cells are arranged in a "honeycomb" pattern, each bordering the next so that users are passed between facilities as they travel. Communications facilities are essentially antennae mounted upon existing structures, new communications towers, and even include smaller units placed upon telephone and power line poles. Transmissions between communications facilities and mobile users operate on a "line of sight basis." As a result, antennae height becomes a crucial factor in areas with hilly or mountainous terrain and other physical obstructions.

APT's PMTA service honeycomb suffered from a gap in coverage along the major Route 8 corridor in the Township. As a result, APT decided to create a new cell by installing a new communications facility in the Township. Because the Township's topography is marked by rolling hills, APT decided to build a new communications tower to provide the height necessary to provide efficient service in the new cell. APT identified a suitable site at 130 Winters Road, which is owned by Chris Smith ("Smith Property"). The site was located on a 73 acre tract in a rural wooded area in the Township's residential RE zoning district ("RE District"). Soon thereafter, however, the Township passed Ordinance 109 which amended the existing zoning regime to restrict communications towers to the Township's light industrial M Districts.1

_____

1. Ordinance 109 imposes conditions upon tower construction in the M District including requiring that all towers be: (1) "stealth" designed; (2)

To comply with the new Ordinance, APT conducted a three month investigation to find a suitable tower site in one of the Township's three M Districts. APT eventually concluded, however, that land in the M Districts was either not technologically feasible or unavailable. APT then decided to enter into a lease agreement for the Smith Property and applied to the Township's Zoning Hearing Board ("ZHB") for a zoning variance to except the Smith Property from Ordinance 109's prohibition upon communications towers in RE Districts. APT proposed to erect a 160È lattice tower that could accommodate six antennae and would not require FAA lighting. In the event that the ZHB concluded that a variance was not in order, the application asserted two additional alternative grounds for relief by claiming that the Township's zoning regime (i) was impermissibly exclusionary under the Pennsylvania Constitution, and (ii) violated S 332(c)(7)(B)(i)(II) of the TCA because it "had the effect of prohibiting" the provision of PCS services in the Township. APT contended that both alternative grounds entitled it to site specific relief permitting it to build its proposed tower on the Smith Property.

The ZHB held a public hearing to consider APT's application. Normally, three ZHB officers preside over such hearings, but only two officers were available for APT's hearing. Nonetheless, APT and the Township consented to have their dispute resolved by a two-officer board. APT presented documentary exhibits and three witnesses in support of its application. A number of members of the public spoke in opposition to APT's proposal.

The ZHB issued a written decision with findings of fact and conclusions of law that denied APT's requests. The

_____

setback from neighboring property by the larger of (a) the tower's height, (b) the minimum setback mandated in the district or (c) 50 feet; (3) fenced and landscaped; and (4) no higher than 200 feet. Additionally, Ordinance 109 discourages lighting of the tower unless required by the Federal Aviation Administration ("FAA"), and places the burden upon the wireless provider "to demonstrate, using technological evidence, that the antenna must go where it is proposed in order to satisfy its function in the company's grid system." (A34-8)

decision summarized the legal requirements for a variance and explained that APT had failed to satisfy those requirements. With respect to APT's two alternative challenges to Ordinance 109's validity, the decision stated that "by reason of a split decision by the [ZHB], with only two members participating, the challenges to the Ordinance are deemed denied." (A42)

APT then filed this suit in the District Court to challenge the ZHB's decision. Treating the parties' submissions as cross-motions for summary judgment, and considering only the ZHB's record, the District Court agreed with APT that Ordinance 109 was impermissibly exclusionary, but denied APT's federal claims. It entered an order directing the Township to allow APT to build its tower on the Smith Property. Both parties appeal.

II.

Congress enacted the TCA to provide "a pro-competitive, de-regulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 1124. Section 332(c)(7) of the TCA expressly preserves the traditional authority enjoyed by state and local government to regulate land use and zoning, but places several substantive and procedural limits upon that authority when it is exercised in relation to personal wireless service facilities:

> (7) Preservation of local zoning authority
>
> (A) General authority
>
> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
>
> (B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

(I) shall not unreasonably discriminate am ong providers of functionally equivalent services; and

(II) shall not prohibit or have the effect  of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentalit y thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local

6

government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

47 U.S.C. S 332(c)(7).

Two of the TCA's limitations on state and local regulation of land use are implicated in this appeal. The first is its ban on regulations that "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. S 332(c)(7)(B)(i)(II). The second is the requirement that any denial of a request to place, construct, or modify personal wireless service facilities must "be in writing and supported by substantial evidence contained in a written record." Id. S 337(c)(7)(B)(iii). To enforce these and the TCA's other limitations on the exercise of state and local authority, the TCA provides parties like APT, who have been adversely affected by a decision affecting wireless service facilities, with a cause of action to challenge those decisions in any court of competent jurisdiction. See id. S 332(c)(7)(B)(v).

In this case, APT presented the ZHB with a "request to . . . construct . . . [a] personal wireless service facilit[y]" that triggered the ZHB's duty to abide by the TCA's substantive and procedural limitations.[2] APT does not claim before us that the ZHB improperly denied its application for a variance.[3] Nor does it dispute that the grant of its application would be inconsistent with the provisions of Ordinance 109. It does claim that Ordinance 109 violates the Pennsylvania constitution because it is impermissibly exclusionary and the TCA because it has the effect of prohibiting the provision of personal wire services. Additionally, APT insists that the ZHB's denial of permission to proceed on the

_____

2. There is no dispute that APT's proposed tower constitutes a "personal wireless service facility" under the TCA. See id. S 332(c)(7)(C)(ii).

3. Under the relevant portion of the Pennsylvania statute, 53 P.S. S 10910.2, a variance was available only if the property had unique physical attributes that prevented it from being utilized in accordance with the restrictions of the zoning law. As the District Court noted, the Smith property had unique physical attributes, but those attributes concededly did not prevent it from being utilized in conformity with the applicable zoning law.

7

Smith property cannot stand, because its decision on the constitutional issue and its decision on "the effect of prohibiting" issue were not "in writing and supported by substantial evidence contained in a written record" as required by the TCA. We will address this procedural issue first.

III.

Subsection 332(c)(7)(B)(iii), which imposes the requirement that any denial "be in writing and supported by substantial evidence contained in a written record," obviously contemplates a written record compiled before the state or local decision-making authority, a writing evidencing that authority's decision, and judicial review of the decision by the traditional, deferential "substantial evidence" standard.[4] It thus seems apparent that subsection 332(c)(7)(B)(iii) is intended to provide procedural protections with respect to determinations of factual issues made by a state or local authority in the course of applying state and local zoning law -- i.e., issues like the ones resolved in the ZHB's opinion in this case.[5] By contrast, it also seems apparent that subsection 332(c)(7)(B)(iii) is not

_____

[4]. It is unclear at this point whether the requirement of a "decision . . . in writing" is satisfied by a writing that simply memorializes the ultimate conclusion or requires findings of fact supporting the denial. Compare AT&T Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423 (4th Cir. 1998) (when Congress has intended to require a written decision with factual findings, it has expressly done so; it did not in S 322(7)(B)(iii)) with Smart SMR of N.Y, Inc. v. Zoning Commission of the Town of Stratford, 995 F. Supp. 52, 56 (D. Conn. 1998) (findings of fact required); Illinois RSA No. 3, Inc. v. County of Peoria, 963 F. Supp. 732, 743 (C.D. Ill. 1997) (same); Western PCS II v. Extraterritorial Zoning Auth., 957 F. Supp. 1230, 1236 (D.N.M. 1997) (same). We find it unnecessary to resolve in this case whether memorialization of the denial will suffice.

[5]. As we have indicated, the ZHB issued a written decision memorializing its denial of APT's application. That decision included findings of fact, based on substantial evidence, that were inconsistent with APT's entitlement to a variance from the requirements of Ordinance 109. It also noted the uncontested facts indicating that permission for APT to proceed would be inconsistent with the requirements of Ordinance 109.

8

intended to apply to decisions that are not to be made solely on the basis of the factual record before the agency and that are not to be the subject of deferential substantial evidence review.

We have recently held, for example, that the substantial evidence review contemplated by subsection 332(c)(7)(B)(iii) is not applicable to the issue of whether a state's denial of an application to construct a personal wireless service facility "has the effect of prohibiting the provision of personal wireless services." See Cellular Telephone v. Ho-Ho-Kus, No. 98-6484, ___ F.3d ___ (3d Cir. 1999). That decision is to be made de novo by a reviewing court that will not necessarily be limited to the record compiled by the state or local authority. Based on Ho-Ho-Kus, we conclude that APT's procedural challenge to the ZHB's decision regarding "the effect of prohibiting" issue must be rejected.

We reach a similar conclusion with respect to the decision on the validity of Ordinance 109 under the Pennsylvania Constitution. We simply do not believe that this was the kind of decision that Congress had in mind when it passed subsection 332(c)(7)(B)(iii). A decision on the "exclusivity" of a zoning ordinance under the Pennsylvania Constitution is a legal issue that is not subject to deferential judicial review. See Borough of Edgewood v. Lamanti's Pizzeria, 556 A.2d 22 (Pa. Commonw. Ct. 1989). While such decisions may involve some consideration of legislative facts, the evidence to be considered is not limited to the facts of the particular applicant's case and is not necessarily limited to the record compiled by the local authority.

We thus reject APT's procedural challenges and turn to its substantive arguments.

IV.

Pennsylvania law presumes that zoning ordinances are "valid and constitutional, [and] thus places a heavy burden on anyone challenging the ordinance to prove contrary." Benham v. Board of Supervisors of Middletown Twshp. , 349 A.2d 484, 487 (Pa. Commw. Ct. 1975); Ficco v. Board of Supervisors of Hempfield Twshp., 677 A.2d 897, 899 (Pa.

9

Commw. Ct. 1996). "This presumption can be overcome by proof that the ordinance totally excludes an otherwise legitimate use." Farrell v. Worcester Twshp. Bd. of Supervisors, 481 A.2d 986, 989 (Pa. Commw. Ct. 1984); accord Ficco, 677 A.2d at 899; Overstreet v. Zoning Hearing Bd. of Schuylkill Twshp., 618 A.2d 1108, 1112–13 (Pa. Commw. Ct. 1992). Exclusionary ordinances take two forms: de jure and de facto. De jure exclusion exists where "the ordinance, on its face, totally bans a legitimate use." Farrell, 481 A.2d at 989. De facto exclusion exists "where an ordinance permits a use on its face, but when applied acts to prohibit the use throughout the municipality." Id.; see Borough of Edgewood v. Lamanti's Pizzeria, 556 A.2d 22, 24 (Pa. Commw. Ct. 1989). "Exclusionary impact can invalidate an ordinance; exclusionary intent is not necessary." Overstreet, 618 A.2d at 1113.

If a party rebuts the presumption of constitutionality by presenting sufficient evidence that an ordinance is exclusionary, the burden then shifts to the state to demonstrate that the zoning ordinance "b[ears] a substantial relationship to public health, safety and welfare." Lamanti's, 556 A.2d at 24; see Exton Quarries, Inc. v. Zoning Bd. of Adjust. of W. Whiteland Twshp., 228 A.2d 169, 179 (Pa. 1967)("[A] zoning ordinance which totally excludes a particular business from an entire municipality must bear a more substantial relationship to the public health, safety, morals and general welfare than an ordinance which merely confines that business to a certain area in the municipality.").

Employing this analysis, the District Court determined that Ordinance 109 is de facto exclusionary because it effectively prohibits the construction of communications towers throughout the Township. According to the District Court:

> The record contains undisputed evidence that the majority of all M Districts are unsuitable for the erection of communications towers. Specifically, APT introduced testimony that the M Districts are [1] restricted to low-lying areas; [2] are too far away from Route 8 for transmission purposes; and [3] that they abut a stream bed in a floodplain area, and thus could

10

be unsound from a geotechnical standpoint. Given that unique topographical and geographical features are necessary for the erection of communication towers, and that only limited areas in Penn Township incorporate such characteristics, I find [Ordinance 109 exclusionary].

(A12-13). The Court observed that, while the record indicated that some portions of the M Districts were suitable for APT's needs, the owner of these lands, the Spang corporation, refused to lease them to APT. Relying upon Borough of Edgewood v. Lamanti's Pizzeria , 556 A.2d 22 (1989), the Court concluded that the unavailability of suitable land rendered Ordinance 109 de facto exclusionary and, because the Township had offered no evidence to prove Ordinance 109's substantial relationship to public health, safety or general welfare, declared it unconstitutional.

The Township claims that the District Court erred because the record indicates that APT failed to carry its "heavy burden" to rebut the presumption of Ordinance 109's constitutionality by showing that it effectively excludes the construction of any communications towers throughout the Township. It observes that Ordinance 109 provides ample amount of land--more than 600 acres--in the M Districts where such towers may be built and that APT's evidence before the ZHB established only that APT was unable to negotiate a lease for some of that land to build a tower necessary for APT's system. According to the Township, APT did not provide any record evidence that other wireless service providers could not lease property or had similar technological limitations and were therefore unable to erect functional towers anywhere in the Township. We agree.

Ordinance 109 allows landowners to build communications towers on over 600 acres of land located in three M Districts: (i) the Eastern M District, (ii) the Central M District, and (iii) the Northwest M District. To succeed on its exclusionary zoning claim before the ZHB, APT had to prove that no telecommunications provider, including itself, could build a functional tower in any of the three M

11

Districts. While APT claims that its evidence did just that, our review of the record indicates that it did not.

Virtually all of APT's evidence before the ZHB focused upon proving that it could not find land in the three M Districts to build a tower that would enable it to fill the gap in its service along Route 8. It is simply not true, as APT maintains, that the record contains evidence that all wireless providers' systems suffer from the same gap and are prevented from filling their gaps by Ordinance 109. Indeed, APT's counsel told the ZHB just the opposite. In response to a question regarding other providers' needs to locate towers in the Township, APT's counsel stated:

> There are currently four carriers or additional carriers. There are four who are currently operating and several additional carriers who have been granted licenses for the area.
>
> One of the important things to remember is that because each system is designed differently, the systems don't have an identical pattern for each carrier so that where as one system may require locating a facility and when I say a facility I don't mean a new tower, it could be antennas locating on a building such as APT has in other areas.
>
> All the systems are different. Each company does not necessarily have to have a facility in each municipality. Because of the system difference among the carriers, where APT may have a facility Sprint doesn't. There could possibly be a facility that AT&T needs but that APT does not require.
>
> * * *
>
> But, again, simply because there are different carriers who have licenses for the same areas, it does not mean that each one will require a tower at the same spot.

(SA97-98, 99)

The fact that the design APT has chosen for its system enables it to erect the tower that it wishes to build only on a relatively small portion of the land in the M Districts does not make Ordinance 109 exclusionary. Pennsylvania's rule

12

against exclusionary zoning does not impose upon a township the duty to assure that all providers, regardless of the systems they have chosen to construct, will have a suitable site for a functioning tower within the township. To be exclusionary, the ordinance must effectively foreclose not only APT's use, but all use. Yet, APT provided no evidence to the ZHB that other providers could not use any of the 600 acres of M District land to build a tower that would functionally meet their systems' needs. Without such evidence we cannot fault the ZHB for determining that APT had failed to meet its "heavy burden" to prove that Ordinance 109 was unconstitutionally exclusionary.

Moreover, we do not believe that APT proved that the concededly feasible M zoned land was unavailable to it. APT's evidence was designed to establish that it had a gap on Route 8 and, due to topographical constraints, only 200 acres of land in the Northwest M District provided the necessary height for APT to build a tower that would reach its system's gap. APT claimed that the Spang corporation owned all of this property and, due to Spang's refusal to lease land to APT, this land was unavailable.

APT claims that this situation is identical to Lamanti's Pizzeria, 556 A.2d at 24. There, the challenged zoning ordinance provided that restaurants could not be located on tracts of land smaller than 30 acres, and the only parcel meeting this minimum size requirement in the municipality carried a sales price of $5 million. The Pennsylvania Commonwealth Court held that the ordinance was de facto exclusionary because, due to the prohibitive price of the only conforming tract, no land was available in the municipality on which to operate a restaurant.

This case is materially different. This is not a case in which it has been demonstrated that locating the proposed use in the Township is not economically feasible. APT's evidence regarding the Spang property reveals only that an APT representative approached Spang regarding the availability of a lease and received a negative response. The record does not disclose anything else about the terms, if any, of APT's offer to lease or Spang's response. Nor is there any indication that APT made any effort to purchase the property. Without such evidence, one simply cannot know

13

if it is economically feasible to locate a tower on the Spang property.6

In sum, the relevant inquiry here is not whether Ordinance 109 precludes APT from filling its service gap the way it would like at a price it would like to pay. The relevant issue is whether, despite the extensive amount of land where towers are permitted in the Township, Ordinance 109 effectively precludes any service provider from building a functional tower in the Township. APT's evidence before the ZHB is relevant only to the former. This record is remarkable not for what it contains, but for what it does not. Pennsylvania law imposed a substantial burden upon APT to rebut Ordinance 109's presumption of constitutionality. We conclude that the ZHB was entitled to find that APT had not carried its burden in this case.

V.

We next consider APT's claim that Ordinance 109 has "the effect of prohibiting the provision of personal wireless

_____

6. We also note that some record evidence indicates that 20 acres of feasible land not owned by Spang may have been available in the Northwest M District. Keith McCombs, a civil engineer, testified for APT regarding its search for appropriate land in the Township. His testimony on cross-examination included the following exchange:

> Q. Ms. Stoker's testimony, as I remember it, was t hat there is approximately 600 acres in the northwest M Zone and of that approximately one third of it is suitable. So that give[s] us 200 acres
> more or less. As I understand it approximately 90 percent is Spang property, so that would leave us 20 acres with other property owners?

> A. Yes, but 100 percent of the availability in the  M District is Spang.

(SA 86) It is unclear from the record what McCombs meant by 100% of the available land is Spang owned, especially since his testimony is that the Spang property is unavailable because Spang would not lease it to APT. This statement contradicted his earlier statement on direct that all of the suitable property in the Northwest M District was owned by Spang. APT's expert testimony on this issue is ambiguous, and lends further support to the ZHB's conclusion that APT failed to carry its burden to establish that no land feasible for its use was available under Ordinance 109.

14

services" in violation of 47 U.S.C. S 332(c)(7)(B)(i)(II). As the Township stresses, every municipality's denial of an application to build a wireless service facility will have, to a degree, the "effect of prohibiting personal wireless service" because it will preclude the applicant provider from building a facility to serve its customers. Interpreting the TCA's "effect of prohibiting" clause to encompass every individual zoning denial simply because it has the effect of precluding a specific provider from providing wireless services, however, would give the TCA preemptive effect well beyond what Congress intended. See Town of Amherst v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9, 14 (1st Cir. 1999) ("Obviously, an individual denial is not automatically a forbidden prohibition violating the "effects" provision."); Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 639 (2d Cir. 1999) (rejecting claim that individual denial violates "effects" provision because it would require court to "read the TCA to allow the goals of increased competition and rapid deployment of new technology to trump all other important considerations, including the preservation of the autonomy of states and municipalities."); AT&T Wireless PCS, Inc. v. Virginia Beach, 155 F.3d 423, 428 (4th Cir. 1998) ("[A]ny reading of subsection(B)(i)(II) that allows the subsection to apply to individual decisions would effectively nullify local authority by mandating approval of all (or nearly all) applications . . ."); OmniPoint Communications, Inc. v. Scranton, 36 F. Supp.2d 222, 233 (M.D. Pa. 1999) (" `Were courts to hold that merely because there are some gaps in service in an area . . . the public interest necessarily tips the balance in favor of allowing a variance, local boards would be obliged to approve virtually every application.") (quoting Cellular Telephone Co. v. Borough of Ho-Ho-Kus, 24 F. Supp.2d 359, 374-75 (D.N.J. 1998)); Primeco Personal Communications Ltd. Partnership, No. 97-208-CIV-OC-10B, 1998 WL 565036, at *12 (M.D. Fla. 1998) ("S 332(c)(7)(B)(i)(II) is intended to limit general bans or policies that prohibit or have the effect of prohibiting the provision of wireless services. Any decision to the contrary would be at odds with the plain text of S 332(c)(7)(A), which expressly reserves the bulk of zoning authority to local governing bodies."); Virginia Metronet Inc. v. Board of Supervisors of James City Co., 984 F. Supp. 966, 971 (E.D.

15

Va. 1998) (accepting argument that S 332(c)(7)(B)(i)(II) applies simply to individual denials "would be tantamount to the complete preemption of local authority in areas previously unserved by cellular services . . . [and would be] at odds with the plaint text of 47 U.S.C. S 332(c)(7)(A), which expressly reserves the bulk of zoning authority to local governing bodies.").

We agree with these courts that the "effect of prohibiting" clause cannot be so construed. To do so would provide wireless service providers with a wildcard that would trump any adverse zoning decision that impaired their ability to provide wireless service, and would thereby create the proverbial "exception that swallowed the rule" that would be entirely inconsistent with S 332(c)(7)'s structure. Indeed, we do not understand APT to contend otherwise.

This does not mean, however, that a provider can never establish that an individual adverse zoning decision has the "effect" of violating S 332(c)(7)(B)(i)(II). Rather, it only means that the provider must bring additional proof to the court to demonstrate that the denial is representative of a broader policy or circumstance that precludes the provision of wireless service. The most thoughtful discussion we have found as to how this might be done is found in the recent opinion of the Second Circuit Court of Appeals in Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 639 (2d Cir. 1999). After parsing the text of the TCA, the Court there described the focus of subsection 372(c)(7)(B)(i)(II)'s prohibition in the following terms:

> By speaking in terms of communications between land stations (cell sites that connect directly to land-lines) and mobile stations (wireless telephones) and access to facilities necessary to make and receive phone calls, the plain focus of the statute is on whether it is possible for a user in a given remote location to reach a facility that can establish connections to the national telephone network. In our view, therefore, the most compelling reading of subsection B(i)(II) is that local governments may not regulate personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities. In other words, local governments must allow

16

service providers to fill gaps in the ability of wireless telephones to have access to land-lines.

Id. at 642-43.

The Willoth Court went on to point out that reading the prohibition in this manner did not eviscerate the regulatory authority of zoning boards preserved in the TCA. Local boards may insist that service gaps be closed by the least intrusive means:

A local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means. See Town of Amherst, 173 F.3d 9, 1999 WL 174253, at *5 ("[I]ndividual denial is not automatically a forbidden prohibition," but disallowing "the only feasible plan . . . might amount to prohibiting wireless service."). There are numerous ways to limit the aesthetic impact of a cell cite. It may be possible to select a less sensitive site, see Gearon & Co. v. Fulton County, 5 F. Supp. 2d 1351, 1355 (N.D. Ga. 1998), to reduce the tower height, see Town of Amherst, 173 F.3d 9, 1999 WL 174253, at *6, to use a preexisting structure or to camouflage the tower and/or antennae, see e.g., Cellco Partnership v. Town Plan & Zoning Comm'n of Farmington, 3 F. Supp. 2d, 178, 185, 186 (D. Conn. 1998) (describing antennae placed on water tower, and permitting applicant to reconstruct church steeple with six antennae placed inside); Smart SMT of New York, Inc. v. Zoning Comm'n of Stratford, 995 F. Supp. 52, 59 (D. Conn. 1998) (describing an antenna placed on a billboard and current applicant seeking to conceal tower with seven evergreen trees).

Id. at 643.

The Court further pointed out that, since the focus is on the remote users' access to the national telephone network, the authority of the local board to deny applications is greater where the area which the provider applicant seeks to serve is already served by another provider:

Furthermore, once an area is sufficiently serviced by a wireless service provider, the right to deny

17

> applications becomes broader: State and local
> governments may deny subsequent applications
> without thereby violating subsection B(i)(II). The right
> to deny applications will still be tempered by
> subsection B(i)(I), which prohibits unreasonable
> discrimination. However, it is not unreasonably
> discriminatory to deny a subsequent application for a
> cell site that is substantially more intrusive than
> existing cell sites by virtue of its structure, placement
> or cumulative impact.

Id.

The ultimate holding of the Willoth Court was that the "Act's ban on prohibiting personal wireless services precludes denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines." Willoth, 176 F.3d at 643. 7 We conclude that this reading of subsection 332(c)(7)(B)(i)(II) effects the best accommodation of the two primary goals of the TCA. It preserves the authority of state and local land use planners to the maximum extent consistent with assuring the access of remote users of personal wireless services to the national telephone network.

Given this understanding of subsection 332(c)(7)(B)(i)(II), it is unnecessary for a provider whose application has been denied to show an express ban or moratorium, a consistent pattern of denials, or evidence of express hostility to personal wireless facilities. On the other hand, it is necessary for the provider to show more than that it was denied an opportunity to fill a gap in its service system. In order to show a violation of subsection 332(c)(7)(B)(i)(II) under Willoth, an unsuccessful provider applicant must

_____

7. The Court indicated that the term "significant gaps" embraces a de minimis principle. "Where the holes in coverage are very limited in number or size (such as the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases) the lack of coverage likely will
be de minimis so that denying applications to constuct towers necessary to fill these holes will not amount to a prohibition of service." Willoth, 176 F.3d at 643-44.

18

show two things. First, the provider must show that its facility will fill an existing significant gap in the ability of remote users to access the national telephone network. In this context, the relevant gap, if any, is a gap in the service available to remote users. Not all gaps in a particular provider's service will involve a gap in the service available to remote users. The provider's showing on this issue will thus have to include evidence that the area the new facility will serve is not already served by another provider.8

Second, the provider applicant must also show that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve. This will require a showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc.

We agree with the District Court that APT has not tendered evidence which would support a conclusion that the ZHB's denial had the effect of prohibiting the provision of personal wire services. As we have noted, APT has successfully established that the design it has chosen for its system enables it to erect the tower that it wishes to build only on a relatively small portion of the 600 available acres. APT's evidence, however, tells one nothing about whether the other providers were already servicing the Route 8 corridor and, if so, how that service was being provided. While the record shows that APT considered other sites and the feasibility of a tower of lesser height on the Smith site, it would not support an inference that APT's proposal was the least restrictive means of achieving a significant gap in service.

_____

8. As the Willoth Court pointed out, even if the area to be served is already served by another provider, the TCA may invalidate the denial of a variance if it has the effect of unreasonably discriminating between providers. Securing relief under this provision of the statute will require
a showing that the other provider is similarly situated, i.e., that the "structure, placement or cumulative impact" of the existing facilities makes them as or more intrusive than the proposed facility.

19

VI.

For the foregoing reasons, we will reverse the judgment of the District Court and remand with instructions to enter judgment for the Township.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

20